23cv3566
Judge Wood
Magistrate Judge Fuentes
Randomly Assigned CAT 2

Case: 1:23-cv-03566 Document #: 6 Filed: 06/08/23 Page 1 of 10 PageID #:16

FILED KL
6/8/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

RECEIVED JB
6/6/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| Plaintiff, | ( | United States District Court |
|  | ( | Northern District of Illinois |
|  | ( |  |
| Amanda Sima | ( |  |
|  | ( |  |
|  | ( |  |
|  | ( |  |
| v. | ( |  |
|  | ( |  |
|  | ( |  |
| Defendants, | ( |  |
|  | ( |  |
| Benesch, Friedlander, Coplan & | ( |  |
| Aronoff LLP, | ( |  |
| Justin Barker, Esq., | ( |  |
| Alyssa Moscarino, Esq. | ( |  |

## COMPLAINT FOR DAMAGES AND JURY DEMAND

1. Comes now Plaintiff Amanda Sima, and for her complaint for damages and jury demand against Defendants Benesch, Friedlander, Coplan & Aronoff LLP, Justin Barker, Esq., Alyssa Moscarino, Esq, allege and state as follows:

### THE PARTIES

2. Plaintiff, Amanda Sima, is and was at all material times residing in Castle Pines, Colorado.

3. Defendant, Benesch, Friedlander, Coplan & Aronoff LLP, has a principal place of business in Cleveland, Ohio.

4. Defendant, Justin Barker, is and was at all material times residing in Chicago, Illinois.

1

5.      Defendant, Alyssa Moscarino, is and was at all material times residing in Cleveland, Ohio.

## JURISDICTION AND VENUE

6.      Venue in this judicial district is proper under 28 U.S. Code § 1332. Diversity of citizenship exists among all parties, and the damages sought exceed $75,000. Defendant has business relations within the district of this court.

## STATEMENT OF THE CASE

7.      On October 14, 2022, Plaintiff retained the law firm of Benesch, Friedlander, Coplan & Aronoff after extensive discussions with Defendants pertaining to their firm's abilities and reputation to handle multiple claims she had against Waddington North America, Inc. (parent company Novolex Holdings LLC) and F.M. Turner Company. On October 26, 2022, Plaintiff sent a retainer via wire transfer of $20,000 to Defendants for their services.

8.      Before contacting Defendant Moscarino, Plaintiff had been in contact with Novolex's deputy general counsel directly regarding her claims. The deputy general counsel indicated that they were open to a conversation between counsels regarding a settlement arrangement, and directed Plaintiff to their outside counsel, Ashley Summer with Nelson Mullins Riley & Scarborough law firm. Defendants were retained to investigate claims against both WNA and F.M. Turner, assist in securing litigation funding in the event the case went to trial, and engage in

settlement discussions with outside counsel for Defendants Novolex Holdings LLC and F.M. Turner Company.

9. On January 13, 2023, Defendants sent an email to F.M. Turner, requesting a phone call to discuss Plaintiff's claims. On January 17, they received a response in writing from their outside counsel, Erin Poplar with Giardini, Poplar & Mason, LLC. The response denied any wrongdoing. Defendants made no response, indicating they first wanted to see how discussions with opposing counsel Summer and Novolex played out.

10. Discussions between Defendants and opposing counsel Summer began January 13, 2023, when Defendant Barker communicated to opposing counsel Summer that Plaintiff was seeking well in excess of $1 million to settle the dispute. Due to opposing counsel Summer's unprepared response to Plaintiff's allegations and multiple mistakes he made on the initial call, Plaintiff and Defendants were confident in forging some sort of settlement on a subsequent call. As such, Plaintiff instructed Defendants to communicate to Ashley that she wished her settlement funds be distributed to two important causes to her: a non-profit founded in her late mother-in-law's memory that supports cancer research and foster care, and a venture capital fund with a focus on investing in underrepresented founders.

11. On February 13, 2023, opposing counsel Summer and Defendants met via Zoom once more to continue discussions. During this call, opposing counsel Summer pivoted positions, stating that they could disprove Plaintiff's claims with a document.

3

12. They continued communicating until March 2023. During this time, Defendants also participated in multiple due diligence calls with litigation funders in an attempt to secure their required budget of $2.8 million to litigate the case. They were unsuccessful progressing on this account.

13. After months of discussion, opposing counsel Summer sent this so-called documented evidence under an attorney's eyes-only agreement. Upon investigation, the document only strengthened Plaintiff's claims. But Defendants ignored that fact, downplayed the importance, and suggested Plaintiff drop her case.

14. Having reached the peak of suspicion, Plaintiff confronted Defendant Moscarino on the integrity of the representation after disagreeing on obvious material facts of the case, multiple months of engagement and over $50,000 in fees.

15. On April 26, 2023, Defendants terminated their representation of Plaintiff without warning or explanation. Upon pressing further for an explanation, Defendant Moscarino replied "you have not paid for our services," even though Plaintiff had paid a $20,000 retainer.

16. On May 9, 2023, Plaintiff attempted to retain a new firm based in Boston. The attorney requested to speak with the former partner on her case. She indicated he should call Justin Barker in the Benesch Chicago office. After their call, she received an email from the attorney stating that Defendant Barker was now a partner with Nelson Mullins Riley & Scarborough. Plaintiff had not been notified by her former counsel or the law firm of this

4

development. She later discovered Defendant Barker had taken a position with Nelson Mullins the same month she was terminated by the firm.

17. Upon further investigation, on May 17, 2023, Plaintiff discovered that Defendant Barker secured a deal with opposing counsel's firm to also recruit seven other attorneys from the Benesch law firm and multiple clients, including a large energy company. She confronted Defendant Moscarino with this information. Instead, Defendant Moscarino passed along that correspondence to Sara Starrfield, Chief Risk Management Officer for Benesch. Starrfield replied, "Your new counsel should make sure the appropriate screens are in place," implying that it was Plaintiff's fault for not protecting herself from this conduct.

18. On May 19, 2023, Plaintiff contacted Erin Poplar, outside counsel for F.M. Turner Company to state she was now representing herself in these settlement matters, in an attempt to continue discussions. Attorney Poplar indicated F.M. Turner would not be engaging in settlement discussions.

19. On May 18, Plaintiff contacted opposing counsel Summer, outside counsel for Novolex, to state she was now representing herself in these settlement matters, in an attempt to continue discussions. On May 22, opposing counsel Summer responded, indicating he would confer with his client. Plaintiff replied this was not necessary, as she had learned of the conduct of the counselors and insisted these discussions were now too perverse to continue ethically.

5

20. Defendant Barker engaged Plaintiff under the disguise of legitimate legal representation and executed a contract to that effect. He then continuously and purposely undermined her case for the duration of his engagement to secure a power arrangement with opposing counsel's firm. The same months he was representing Plaintiff, he was also recruiting attorneys within his own firm and convincing clients to follow him to Nelson Mullins. He colluded with opposing counsel Summer on the concept of a fake document to disprove Plaintiff's claims and assured him he would be successful in creating a narrative that she did not have a viable case, as if this would justify his transition. When this backfired, he moved swiftly to his new firm without Plaintiff's knowledge and to his former employer's surprise.

21. Upon discovering Defendant Barker's conduct, Defendant Moscarino, nor the law firm, disclosed this to Plaintiff. Instead, they terminated the representation to protect themselves from impropriety, and disguised this termination under non-payment of the illegitimate billing. Plaintiff later determined the termination letter was sent the same day that a press release from Nelson Mullins was published about the transaction.

22. This conduct led to the dissipation of multi-million-dollar settlement discussions with both opposing parties, and deemed all charged fees as illegitimate. The confidentiality required of settlement discussions and shared internal details of her case with opposing counsel makes further litigation of the underlying matter impossible.

## CLAIMS

### COUNT 1: FRAUD

23. Through their fraudulent actions disguised as legitimate legal counsel, Defendants spent much of their representation of Plaintiff advising her to the benefit of opposing counsel and his clients. Plaintiff relied on this advice and, although many times suspicious and in disagreement, made decisions in accordance with their advice. Defendants ignored material facts and opposing counsel's conduct and justified it as normal to the Plaintiff, allowing for seven critical months to pass with little development in the case against a looming statute of limitations deadline. Defendants purposely undermined Plaintiff's case with litigation funders when she was not present and advised her multiple times against filing a lawsuit without funding in place. Defendants induced the Plaintiff into a non-disclosure agreement with opposing counsel regarding their documented evidence, preventing her from acquiring important information. This document, critical to her claims, cannot be seen or used by her in any future legal proceedings. Additionally, Defendants charged the Plaintiff a $20,000 retainer and an additional $36,543 in fees while actively working against her case, a fraudulent misrepresentation of the charges.

### COUNT 2: CIVIL CONSPIRACY

24. Defendants Moscarino and Benesch, Friedlander, Coplan & Aronoff LLP, colluded to hide Defendant Barker's conduct and transition to opposing counsel's firm from the Plaintiff, through a termination under the disguise of unpaid fees. Defendants did this to insulate themselves from Defendant Barker's conduct, for which they are vicariously liable.

## COUNT 3: BREACH OF CONTRACT

25.     Plaintiff hired counsel to explore potential claims, pursue litigation funding and complete tasks necessary to attempt to obtain that funding, draft a letter to potential parties regarding the aforementioned potential claims, negotiate those potential claims with the parties and, if represented, their counsel, and provide services related to attempting to obtain an early resolution of those potential claims, including through communications, mediations, or another platform. Defendants failed to fulfill their promised obligations, due to the ongoing compromising relationship with opposing counsel.

## COUNT 4: BREACH OF FIDUCIARY DUTY

26.     By securing an employment position and implementing full blown recruitment within the firm to transfer to opposing counsel's firm while representing Plaintiff, Defendants egregiously neglected to act in Plaintiff's best interest. Instead, they were acting on behalf of their own. Opposing counsel of the Plaintiff colluded with Defendant Barker to access intimate details of Plaintiff's case and concoct a safe exit strategy for his clients in return for a partner position with their firm. This was a mutually beneficial arrangement for all parties at the detriment of the Plaintiff.

## COUNT 5: BREACH OF GOOD FAITH COVENANT AND FAIR DEALING

27.     Defendants were purposely undermining Plaintiff's case to the direct benefit of opposing counsel. They ignored important material facts, dismissed others, and tried to convince the Plaintiff multiple times, despite the evidence, to drop her case.

### COUNT 6: TORTIOUS INTERFERENCE

28. Major leverage in the Plaintiff's case was the invalidation of her opponent's patent, giving her the ability to sell or license her design to a competitor. By purposely sabotaging her case, Defendants prevented this opportunity for the Plaintiff.

### COUNT 7: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

29. The very same week the Plaintiff retained Defendants, she confided in her attorneys with the following statement: "I just want to say this is the first week I have had in a while without debilitating panic attacks and anxiety. It's hard to fully explain the impact this experience has had on me, my physical and mental health, and even my family. I cannot thank you enough for believing in me, and for simply trying." Unlawful acts and the subsequent legal matters in relation to those acts are often debilitating to people who have been harmed. Legal counsel have a duty to protect the interests of their clients that might prevent further harm. The gross negligence of protecting the Plaintiff has not only returned her to a debilitating emotional state but has worsened it. Plaintiff suffers from panic attacks, paranoia, and depression from these events.

### COUNT 8: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

30. The very same week the Plaintiff retained Defendants, she confided in her attorneys with the following statement: "I just want to say this is the first week I have had in a while without debilitating panic attacks and anxiety. It's hard to fully explain the impact this experience has had on me, my physical and mental health, and even my family. I cannot thank you enough for believing in me, and for simply trying." Unlawful acts and the subsequent legal matters in relation to those acts are often debilitating to people who have been harmed. Legal

counsel have a duty to protect the interests of their clients that might prevent further harm. Defendants knew that, by colluding with opposing counsel and egregiously putting the Plaintiff in an irrevocable defensive position, her weakened emotional state would resume and therefore lessen the chances of continued pursuit.

## COMPENSATORY DAMAGES

31. Plaintiff is seeking $25,020,000 in compensatory damages for dissolved settlement discussions seeking this amount plus the illegitimate collection of a $20,000 retainer.

## PUNITIVE DAMAGES

32. Plaintiff seeks $50,000,000 in punitive damages. Plaintiff is entitled to an award of punitive and exemplary damages based upon Defendants' intentional, willful, knowing, fraudulent, malicious acts, omissions, and conduct, and Defendants' reckless disregard for the welfare of their client and her case. Defendants intentionally and fraudulently misrepresented facts and information relevant to the case and their position to the Plaintiff.

DATED: June 6, 2023                    PLAINTIFF, Amanda Sima

                                       X

                                       /S/Amanda Sima

                                       Address: 561 Bristolwood Lane

                                                Castle Pines, CO  80108

                                       Phone:   614-260-8222