UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMANDA SIMA, | |
|       Plaintiff, | Case No. 1:23-cv-03566 |
| v. | |
| BENESCH, FRIEDLANDER, COPLAN, & ARONOFF LLP, JUSTIN BARKER, and ALYSSA MOSCARINO, | Judge John Robert Blakey |
|       Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Amanda Sima sues Defendants Benesch, Friedlander, Coplan & Aronoff LLP ("Benesch"), Justin Barker, and Alyssa Moscarino, alleging eleven claims related to a previous legal representation. Plaintiff alleges fraudulent inducement (count I), fraudulent omission (count II), fraudulent misrepresentation (count III), fraudulent concealment (count IV), constructive fraud (count V), civil conspiracy (count VI), breach of contract (count VII), breach of fiduciary duty (count VIII), breach of good faith covenant and fair dealing (count IX), tortious interference (count X), and intentional infliction of emotional distress (count XI), *see* [23]. The Defendants jointly move to dismiss all the claims, [27]. For the reasons explained below, the Court grants the Defendants' motion in full.

1

I. **Factual Allegations**[1]

Benesch, Friedlander, Coplan, and Aronoff LLP is a law firm with its primary office in Ohio. [23] ¶ 3. Plaintiff's claims arise from Benesch's legal representation of Plaintiff in a product theft case. *Id.* ¶ 11.

In 2013, Plaintiff designed a spill-proof children's lid, branded as JoJo Cups. *Id.* ¶ 7. In November 2017, Plaintiff contacted Waddington North America, Inc. ("Waddington") (now a part of parent company Novolex Holdings, Inc. ("Novolex")) to inquire about the company manufacturing her lids. *Id.* ¶¶ 7, 11. She also pursued an agreement for sales representation with F.M. Turner Company and provided the company with confidential materials. *Id.* ¶ 8. In July 2019, Plaintiff learned that F.M. Turner Company also represented Waddington, who began producing lids with a nearly identical design to that of Plaintiff's JoJo Cups and had obtained a utility patent on the "copycat product." *Id.* ¶¶ 8–10.

In September 2022, Plaintiff sent a letter to Novolex, Waddington's parent company, about her claims of product theft. *Id.* ¶ 11. She also contacted multiple law firms to represent her in claims against Novolex, which included "trade secret theft, unfair business practices, unjust enrichment, and breach of contract." *Id.* ¶ 11. She contacted Benesch attorneys Alyssa Moscarino, Justin Barker, and Michael Montgomery on October 6, 2022. *Id.* ¶ 11.

---

[1] The Court draws these facts from Plaintiff's Second Amended Complaint, [23], which it accepts as true for purposes of Plaintiff's motion to dismiss. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

2

On October 12, 2022, Novolex's Deputy General Counsel, Lori Goldin, emailed Plaintiff about the possibility of a settlement and directed her to Ashley Summer, Novolex's outside counsel at Nelson Mullins Riley & Scarborough. *Id.* ¶ 13. On October 14, 2022, Plaintiff retained Benesch for a limited engagement involving researching and investigating the claims, drafting a demand letter, and negotiating a settlement to resolve the potential claims. *Id.* ¶ 15. Per Benesch's engagement letter, its representation would not include "drafting or filing a Complaint or otherwise initiating or participating in a lawsuit." [27-1] at 1.[2]

Plaintiff paid a retainer of $20,000 on October 26, 2022, but, soon after, fell behind on paying her legal fees, due to her confusion with the retainer payment. [23] ¶ 15. Defendant Moscarino explained that the retainer did not impact the legal fees, which Benesch billed to Plaintiff monthly. *Id.* ¶ 16. Plaintiff remained unable to pay her legal fees. *Id.*

After retaining Defendants, Plaintiff communicated with them on multiple occasions regarding her claims. *Id.* ¶ 17. Without ever contacting Novolex's outside counsel, Defendant Barker informed Plaintiff that she did not have a viable trade secret claim. *Id.* Plaintiff presented alternative claims, which Barker agreed to consider. *Id.* Plaintiff alleges that Defendants eventually indicated to her that she could receive a jury verdict in excess of $100 million and agreed to pursue a settlement for a fraction of this amount. *Id.* ¶ 19.

---

[2] The Court may properly consider the engagement letter attached to Defendants' motion to dismiss as a document that is referred to in the complaint and central to Plaintiff's claim. *See Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018).

Although Barker discouraged Plaintiff from pursuing litigation funding, he and Moscarino also insisted upon representing her in discussions with a litigation funder from whom Plaintiff had already received a term sheet. *Id.* ¶ 18. They participated in calls with litigation funders, which proved unsuccessful, and thus they would not agree to litigate without the funding. *Id.* ¶ 23.

On January 13, 2023, Barker informed Novolex's outside counsel that Plaintiff was seeking a settlement of more than $1 million. *Id.* ¶ 21. On February 13, 2023, in a meeting involving Barker, Moscarino, and Ashley Summer from Nelson Mullins, Summer claimed to possess a document disproving Plaintiff's claim. *Id.* ¶ 22. Defendants convinced Plaintiff to allow Summer to confidentially send this document to Defendants through an "attorney's-eyes-only" arrangement. *Id.* After receiving the document on March 20, 2023, Defendants informed Plaintiff that they believed the document, dated before her communications with F.M. Turner, to be legitimate and "enough to drop her case." *Id.* ¶ 24. Based upon their description of the contents, Plaintiff believed it to be falsified. *Id.* Plaintiff also presented evidence to the Defendants that she had been in contact with Waddington North America on October 24, 2018, the same date as the document. *Id.* ¶ 25. Defendants noted only that the matching dates were "interesting" but did not change their assessment of the case. *Id.* ¶ 26.

Plaintiff requested to have the document inspected by a third party. *Id.* ¶ 27. Upon being informed that this would require consent from Novolex, she reached "the peak of suspicion" with her counsel. *Id.* ¶ 27. Plaintiff confronted Defendants about

4

"the integrity of the representation after disagreeing on obvious material facts of the case, the conduct of opposing counsel, multiple months of fruitless engagement and over $50,000 in fees." *Id.* ¶ 27. Defendants offered a call to discuss, which Plaintiff declined. *Id.* ¶ 26.

On April 26, 2023, Defendants terminated their representation of Plaintiff "without warning or explanation." *Id.* ¶ 28. Moscarino responded to Plaintiff's request for explanation by stating that Plaintiff had not paid her fees. *Id.* ¶ 28.

On May 9, 2023, Plaintiff approached a new firm in Boston about representing her in the underlying case, and an attorney at the firm attempted to speak to Barker as the former partner on the matter. *Id.* ¶¶ 28, 29. Plaintiff learned for the first time that Barker had moved to Nelson Mullins, former opposing counsel, and that press releases about Barker switching firms were released on the same day that Benesch terminated her representation. *Id.* ¶¶ 29, 31. After Plaintiff contacted Moscarino about Barker's departure, Moscarino referred her to Benesch's Chief Risk Management Officer, who told Plaintiff that her new counsel should check for the appropriate screens. *Id.* ¶ 30. The attorney in Boston ultimately declined to take Plaintiff's case. *Id.* ¶ 29.

Plaintiff contends that, due to the actions of Benesch, Barker, and Moscarino, she was left with a case too close to the expiration of the statute of limitations to change course. *Id.* ¶ 32. She also contends that the "public knowledge of the partner on her legal matter absconding for opposing counsel's firm made her case far too prejudiced and perverted to be able to retain new counsel or ethically continue." *Id.*

5

¶ 32. Plaintiff alleges that the Defendants' actions permanently damaged her ability to pursue the underlying legal claims and seeks $25,000,000 for the dissolved settlement agreements, a refund of the $20,000 retainer, and punitive damages of $50,000,000. [23] ¶¶ 52–53.

## II. Applicable Legal Standards

To survive a motion to dismiss, a complaint must not only provide Defendants with fair notice of a claim's basis but must also be "facially" plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim has facial plausibility when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although the complaint need not include detailed factual allegations, Plaintiff must allege more than mere labels and conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Rather, "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together"; in ruling on the motion, the Court asks whether these things could have happened, not whether they did happen. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

On a motion to dismiss, this Court accepts as true all well-pled facts in the complaint and draws all reasonable inferences from those facts in Plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). But the Court "need not accept as true statements of law or unsupported conclusory factual allegations." *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021).

When a plaintiff is pro se, the Court construes her complaint "liberally" and holds her to a "less stringent standard than formal pleadings drafted by lawyers." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). The complaint must, however, still "actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Id.* at 752 (internal citations omitted).

Plaintiff alleges five different counts of fraud: fraudulent inducement (count I), fraudulent omission (count II), fraudulent misrepresentation (count III), fraudulent concealment (count IV), and constructive fraud (count V). Fraud claims (or claims sounding in fraud) remain subject to the heightened pleading standard prescribed in Federal Rule of Civil Procedure 9(b). *United States ex rel. Mamalakis v. Anesthetix Mgmt. LLC*, 20 F.4th 295, 301 (7th Cir. 2021). As a result, "the complaint must allege the circumstances of the fraud with factual particularity." *Id.* This burden requires plaintiff to "describe the 'who, what, when, where, and how' of the fraud." *Id.* (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)). The goal of this rigorous standard is to protect defendants from "the stigmatic injury that potentially results from allegations of fraud." *Id.*

### III. Discussion

Defendants jointly move to dismiss all eleven of Plaintiff's claims, and the Court considers the sufficiency of the claims in turn below.

### A.     Plaintiff's Fraud Claims (Counts I – V)

Plaintiff brings five counts of fraud premised upon Barker's allegedly inappropriate association with opposing counsel during his employment at Benesch; these claims include: (1) fraudulent inducement; (2) fraudulent omission; (3) fraudulent misrepresentation; (4) fraudulent concealment; and (5) constructive fraud. Because the elements of each of Plaintiff's fraud claims overlap in material ways and because Plaintiff premises each claim upon the same alleged conduct, the Court analyzes these claims together.[3]

Under Ohio law,[4] to state a claim for fraud involving misrepresentations, Plaintiff must allege "(1) an actual or implied false representation concerning a fact or, where there is a duty to disclose, concealment of a fact, material to the transaction; (2) knowledge of the falsity of the representation or such recklessness or utter disregard for its truthfulness that knowledge may be inferred; (3) intent to induce reliance on the representation; (4) justifiable reliance; and (5) injury proximately

---

[3] *See Cintrifuse Landlord, LLC v. Panino, LLC*, 201 N.E.3d 488, 501 (Ohio Ct. App. 2022) (fraudulent inducement); *Szep v. GM LLC*, 491 F. Supp. 3d 280, 293 (N.D. Ohio 2012) (fraudulent omission); *Deutsche Bank Natl. Trust Co. v. Pevarski*, 932 N.E.2d 887, 899 (Ohio Ct. App. 2010) (fraudulent misrepresentation); *Allen v. Andersen Windows, Inc.*, 913 F.Supp.2d 490, 514 (S.D. Ohio 2012) (fraudulent concealment); *D & H Autobath v. PJCS Properties I, Inc.*, 983 N.E.2d 891, 900 (Ohio Ct. App. 2012) (constructive fraud).

[4] In diversity cases, "federal courts apply the conflict-of-law rule of the forum state." *Hinc v. Lime–O–Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004). Illinois courts respect "a contract's choice-of-law clause as long as the contract is valid, and the law chosen is not contrary to Illinois's fundamental public policy." *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 705 (7th Cir. 2004). The engagement letter, signed by Benesch and Plaintiff, states that questions arising about the engagement will be governed by "the law of the jurisdiction in which the Benesch attorney sending" the letter principally practices. [27-1] at 7. Because Defendant Moscarino, domiciled and practicing in Ohio, sent the letter, Ohio law governs Plaintiff's claims. *Id.* at 2; [23] ¶ 5.

caused by the reliance." *Cintrifuse Landlord, LLC v. Panino, LLC*, 201 N.E.3d 488, 501 (Ohio Ct. App. 2022).

Plaintiff premises each of her fraud claims upon the allegation that her entire legal relationship with Benesch was a false representation of fact. She claims that Defendant Barker "induced Plaintiff into an attorney-client contract under the disguise of legitimate legal counsel" and induced the "production of critical and confidential details of her legal matter" to benefit opposing counsel, Nelson Mullins, the law firm that Barker later joined. [23] ¶ 34.

Defendants move to dismiss these claims, arguing that Plaintiff's complaint does not allege a legally cognizable injury, nor does it allege that these injuries were proximately caused by the Defendants' behavior. [27]. The Court agrees.

As an initial matter, Plaintiff fails to demonstrate that Defendants' fraudulent conduct caused her any harm. She alleges that the Defendants' conduct left her case "too close to a statute of limitations deadline to change course successfully." [23] ¶ 32. She does not allege, however, which claims would be lost, what the relevant statutes of limitations were, or how the impending expiration dates somehow made the claims impossible to pursue.

Indeed, Plaintiff admits that the statute of limitations had not actually run, alleging that her "case was too close to a statute of limitations deadline to change course successfully." [23] ¶ 32. In assessing claims arising from terminated legal representation, "prime consideration must be given to the situation in which the client was placed at the time of the termination of the legal services." *Rocha v. Rudd*,

9

826 F.3d 905, 909 (7th Cir. 2016) (citing *Mitchell v. Schain, Fursel & Burney, Ltd.*, 773 N.E.2d 1192, 1193–94 (Ill. App. Ct. 2002)). If the cause of action "was still viable" at the time of a terminated relationship with an attorney, Plaintiff cannot assert any damage sustained. *Id.*

Based upon the allegations in her complaint, the Court cannot reasonably conclude that Plaintiff had viable claims whose statute of limitations period had run before Benesch ended its representation. Without alleging facts that any potential claims expired, when they expired, and how such expiration dates caused her harm, Plaintiff cannot establish any injury based upon Defendants' conduct.

This conclusion is further supported by Plaintiff's allegation that it took her only a few weeks to contact and consult with another attorney in Boston about her claim. *Id.* ¶ 9. While the attorney ultimately declined to take Plaintiff's case, Plaintiff does not allege that it related to the approaching statute of limitations or her prior relationship with Benesch. *Id.* Plaintiff makes no additional allegations about how a supposedly approaching statute of limitations impeded her ability to find new counsel or file suit herself.

Additionally, in the engagement letter, Benesch expressly stated, and Plaintiff thus knew, that the engagement would not "include drafting or filing a Complaint or otherwise initiating or participating in a lawsuit." [27-1] at 1. Thus, Plaintiff could not have reasonably expected that Benesch's continued representation would lead to a filing of the claim, and the time until the statute of limitations ran would only have grown shorter had the representation continued.

10

Plaintiff also does not sufficiently plead that Defendants' alleged fraudulent conduct caused the termination of settlement discussions. Ohio courts have held that there "must be a causal connection between the conduct complained of and the resulting loss." *Paterek v. Petersen & Ibold*, 890 N.E.2d 316, 320 (Ohio 2008). Specifically, plaintiffs must be able to connect the amount lost to the conduct of the attorney. *Pipino v. Norman*, 101 N.E.3d 597, 616–17 (Ohio Ct. App. 2017). Plaintiff alleges no plausible connection between the Defendants' conduct and the failed settlement discussions. For example, Plaintiff provides no facts about progress in settlement discussions or how Defendants' conduct hindered any such discussions. In her complaint, she states that Defendants contacted F.M. Turner about her claims and indicated a desire to see how other settlement discussions play out first. [23] ¶ 20. Plaintiff makes no further allegation regarding settlement discussions with F.M. Turner or Defendant's involvement. Thus, Plaintiff fails to support her bare assertion that Defendants' allegedly fraudulent conduct caused her harm.

Plaintiff also fails to plead facts with particularity as to the other elements of her fraud claims. Plaintiff asserts only conclusory statements about the entire representation as a "disguise of legitimate legal counsel" without any "intention of representing Plaintiff fairly from the outset." [23] ¶ 34. These allegations fail to assert the "who, what, when, where, and how" of Defendants' allegedly false representation and fraudulent intent. *Lusby*, 570 F.3d at 853.

For example, Plaintiff alleges that Defendant Barker had a conflict of interest between his representation of Plaintiff and opposing counsel Nelson Mullins. [23] ¶

11

38. Plaintiff does not, however, allege any specific details about the timing of this conflict or how it could have impacted Barker's ability to provide appropriate legal services to Plaintiff. Conclusory statements about a conflict of interest do not meet the heighted pleading requirements of factual particularity under Rule 9. *Mamalakis,* 20 F.4th at 301.

Plaintiff also alleges that Defendants Benesch and Moscarino continued representing Plaintiff without informing her of Defendant Barker's departure from the firm and concealed the fact of his transition, choosing instead to terminate their relationship with Plaintiff to "avoid fraud by omission." [23] ¶¶ 36, 39. But she does not allege that the firm had knowledge of Barker's departure before the date of the press release (which coincided with the date of the termination of representation), *id.* ¶ 31, nor does she allege when the firm first learned of Barker's departure. Plaintiff further fails to allege any benefit that Defendants Benesch and Moscarino received from omitting disclosure of Barker's departure or how such omission impeded their representation of Plaintiff, and Plaintiff also admits to not paying her significant legal bills. *Id.* ¶ 16. Thus, the allegations do not support her theory that Defendants intentionally and fraudulently induced Plaintiff to continue with Benesch's representation.

This Court dismisses Counts I through V.[5]

---

[5] Plaintiff also claims that Defendant Benesch is vicariously liable for Defendant Barker's conduct in multiple claims throughout her complaint. A law firm may only be held vicariously liable if "one or more of its principals or associates are liable." *Natl. Union Fire Ins. Co. of Pittsburgh, PA v. Wuerth*, 913 N.E.2d 939, 945 (Ohio 2009). As Plaintiff has failed to state a claim against Defendant Barker, the vicarious liability claims fail as well.

12

### B. Civil Conspiracy (Count VI)

Plaintiff also brings a claim for civil conspiracy, alleging that Defendants Moscarino and Benesch "colluded to hide Defendant Barker's fraudulent conduct." [23] ¶ 43. Civil conspiracy claims require "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995).

Plaintiff alleges that Defendants Moscarino and Benesch knew of Barker's transition and alleged conflict of interest and colluded to hide this fact by terminating the representation of Plaintiff. [23] ¶ 43. But, as Defendants correctly note, the intercorporate conspiracy doctrine bars this claim. [27]. This doctrine provides that when "all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy." *Amadasu v. The Christ Hosp.*, 514 F.3d 504, 507 (6th Cir. 2008) (quoting *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.,* 926 F.2d 505, 510 (6th Cir. 1991)); *see also Innovative Architectural Planners, Inc. v. Ohio Dep't. of Admin. Servs.*, No. 23AP-116, 2024 WL 987921, at *8 (Ohio Ct. App. March 7, 2024) ("No civil conspiracy exists when all the alleged co-conspirators are members of the same corporate entity because there are not two separate people to form a conspiracy."). This doctrine would bar the claims of collusion between Defendants Moscarino and Benesch.[6]

---

[6] The complaint fails to clarify whether the alleged collusion existed only between Defendants Moscarino and Benesch, or also with Defendant Barker. To the extent this claim includes Defendant Barker, all allegations in the complaint pertain to the period before Defendant Barker's departure from Benesch and thus would also encompass his participation.

As with her fraud claims, Plaintiff also fails to establish that she suffered any harm because of the alleged conspiracy. Plaintiff alleges that she suffered "irreparable harm to legal matters and her ability to recover losses." [23] ¶ 43. But as explained above, her underlying claims remained viable at the time of termination, and she has alleged no facts demonstrating that Moscarino and Benesch's failure to disclose Barker's departure caused any injuries.

Further, a claim for civil conspiracy requires a "heightened standard [to] demonstrate a malicious intent." *Shaker v. Village Voice Media*, Inc., No. 1:04-CV-01881, 2005 WL 1277730, at *3 (N.D. Ohio May 26, 2005). Plaintiff alleges no facts indicating that Defendants acted maliciously. Plaintiff merely states, in conclusory fashion, that the alleged concealment of information about Barker's departure "exceeds the reach of legitimate corporate activity." [23] ¶ 43.

This Court dismisses Count VI.

### C. Breach of Contract (Count VII) and Covenant of Good Faith and Fair Dealing (Count IX)

Plaintiff also asserts a claim for breach of contract, alleging that Defendant Barker breached their retainer agreement by never intending to fulfill his contractual obligations and by engaging in a conflict of interest. [23] ¶¶ 44–45. A breach of contract claim requires a plaintiff to show that "a contract existed, the plaintiff performed, the defendant breached, and the plaintiff suffered damages." *Pavlovich v. National City Bank*, 435 F.3d 560, 565 (6th Cir. 2006).[7]

---

[7] Ohio courts typically analyze breach of contract cases against law firms under the legal standard for legal malpractice. *See Dottore v. Vorys, Sater, Seymour & Pease, L.L.P.*, No. 98861, 2014 WL 72538, at *7 (Ohio Ct. App. Jan. 9, 2014) ("When the gist of a complaint sounds in malpractice, the other

14

Defendants assert, and Plaintiff admits, that she did not pay the required legal fees throughout the engagement. [23] ¶ 16. Because the systemic failure to pay constitutes fair and independent grounds for Defendants to terminate the contractual relationship, Plaintiff cannot succeed on a breach of contract claim.

Moreover, even if Plaintiff had paid her legal significant fees, Defendants substantially performed their contractual obligations. *See Whitt Sturtevant, LLP v. NC Plaza LLC*, 43 N.E.3d 19, 30 (Ohio Ct. App. 2015) (A party "does not breach a contract when that party substantially performs the terms of the contract."). The contract provided that Defendants would assist Plaintiff with "drafting a letter to potential parties," "negotiating those potential claims," and "providing services related to attempting to obtain an early resolution of those potential claims." [27-1] at 1. The engagement letter expressly disclaimed "drafting or filing a complaint" or otherwise "initiating or participating" in a lawsuit. *Id.* The complaint discusses many conversations between Defendants and Plaintiff, as well as opposing counsel, until the Defendants ultimately determined that Plaintiff had no viable claim based upon documents produced by opposing counsel. [23] ¶¶ 24–26. There are no facts to support the allegation that Defendants failed to substantially perform their obligations under the contract.

---

duplicative claims, even those labeled as fraud and breach of contract, are subsumed within the legal-malpractice claim."). Regardless of whether Plaintiff's claim is analyzed as a breach of contract claim or a legal malpractice claim, however, she has failed to plead facts sufficient to state a claim under either theory. *See Fabec v. Frederick & Berler, LLC*, No. 110562, 2022 WL 402938 (Ohio Ct. App. Feb. 10, 2022) (affirming summary judgment in a legal malpractice case when the plaintiff provided no evidence to support the merits of their underlying claim and that, but for the lawyer's conduct, the plaintiff would have received a better outcome).

15

Plaintiff also brings a claim for breach of the covenant of good faith and fair dealing. But, under Ohio law, this claim cannot stand alone as a separate cause of action from a breach of contract claim. *Holmes v. Wilson*, No. 2:08-cv-602, 2009 WL 3673015, at *3 (S.D. Ohio Oct. 30, 2009). Thus, Plaintiff's claim for breach of the covenant of good faith fails for the same reasons explained above. *See Westwinds Dev. Corp. v. Outcalt*, No. 2008-G-2863, 2009 WL 1741978, at *11 (Ohio Ct. App. June 19, 2009) (dismissing covenant of good faith claim because breach of contract claim failed); *Ogle v. BAC Home Loans Servicing LP*, 924 F. Supp. 2d 902, 915 (S.D. Ohio 2013) (same).

This Court dismisses Count VII and Count IX.

### D. Breach of Fiduciary Duty (Count VIII)

Plaintiff brings a claim for breach of fiduciary duty, stemming from Defendant Barker's alleged conflict of interest. [23] ¶ 38. To assert a claim for breach of fiduciary duty under Ohio law, a plaintiff must establish: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom." *Wells Fargo Bank, N.A. v. Sessley*, 935 N.E.2d 70, 83 (Ohio Ct. App. 2010) (internal citations omitted). An attorney-client relationship gives rise to a duty of loyalty, which can be breached by a conflict of interest. *Strickland v. Washington*, 466 U.S. 668, 692 (1984).

Plaintiff alleges that Defendant Barker had a conflict of interest because he left Benesch to join Nelson Mullins, opposing counsel's firm. [23] ¶¶ 29–31, 47. She also alleges generally that the employment change caused Defendant Barker to act

16

in ways that benefited opposing counsel's firm and their client, Novolex. [23] ¶ 34. But she offers no allegations related to any communication between Defendant Barker and Nelson Mullins before his departure from Benesch, when the purported conflict of interest began, or how Barker acted upon it to Plaintiff's detriment. The complaint also contains no allegations of confidences Barkers improperly disclosed or any actions he improperly took in the interest of Nelson Mullins and Novolex.

Further, Plaintiff fails to allege how Defendant Barker's conflict caused her any injury. *Sessley*, 935 N.E.2d at 83. She does not allege that he shared her confidential information with Nelson Mullins or used any information he gained during her representation to benefit his new employer. Nor does she allege how Barker's change in employment prevented him from performing adequate legal work during his time as Plaintiff's counsel. As in Counts I through VI, Plaintiff has failed to allege a legally cognizable injury.

The complaint further alleges that Defendants Moscarino and Benesch breached their fiduciary duties by concealing knowledge of Barker's transition to an opposing firm. While lawyers may generally have a duty to keep clients up to date on the status of their matter, Benesch terminated its representation of Plaintiff on the same date that Barker announced his departure from the firm, and thus the allegations undermine Plaintiff's theory that Defendants Benesch and Moscarino owed Plaintiff an ongoing duty to keep her apprised of Barker's employment status when they no longer represented her.

17

Further, as with her previous claims, Plaintiff has failed to allege how this lack of notice impacted her case. The statute of limitations had not expired, and she could still pursue her claims. Thus, even if Plaintiff has properly alleged a breach of fiduciary duty, she has not demonstrated the requisite injury to state a claim.

This Court dismisses Count VIII.

### E. Tortious Interference (Count X)

Plaintiff also asserts a claim for tortious inference, alleging that the Defendants interfered with a potential business relationship between Plaintiff and Waddington or F.M. Turner. [23] ¶ 50. Under Ohio law, a claim for tortious interference with a business relationship requires: "(1) the existence or the prospect of a business relationship; (2) that the defendant knew of the plaintiff's relationship; (3) that the defendant intentionally and materially interfered with the plaintiff's prospective relationship; (4) the interference was without justification; and (5) the interference caused the plaintiff to suffer damages." *Wilson v. Chagrin Valley Steel Erectors, Inc.*, No. 2:16-cv-1084, 2018 WL 1512906, at *15 (S.D. Ohio Mar. 27, 2018).

Plaintiff alleges that Defendants impacted her ability to "forge a partnership centered around her patent as an alternative to a settlement or litigation" with F.M. Turner or Waddington. [23] ¶ 50. But she pleads no facts that support this theory. To succeed on this claim, Plaintiff must show more than "a mere hope that additional contracts or customers would have been forthcoming" and an actual "reasonable probability that particular anticipated contracts would have been entered into." *One*

18

*Energy Enterprises, LLC v. Ohio Dep't of Transp.*, No. 17AP-829, 2019 WL 453690, at *15 (Ohio Ct. App. Feb. 5, 2019) (internal citations omitted).

Plaintiff does not allege any offers or discussions which suggest that a future business relationship was forthcoming, and the complaint contains no allegations from which the Court could infer that there was a reasonable probability of any such relationship. As a result, Plaintiff's claim for tortious interference fails.

This Court dismisses Count X.

### F. Intentional Infliction of Emotional Distress (Count XI)

Finally, Plaintiff brings a claim for intentional affliction of emotional distress. [23] ¶ 51. To state a claim for intentional infliction of emotional distress under Ohio law, a plaintiff must allege that "(1) defendants intended to cause emotional distress, or knew or should have known that their actions would result in plaintiff's serious emotional distress, (2) defendants' conduct was extreme and outrageous, (3) defendants' actions proximately caused plaintiff's emotional injury, and (4) plaintiff suffered serious emotional anguish." *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995).

Ohio courts narrowly define "extreme and outrageous" as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Crespo v. Cellco Partnership*, No. 1:16-CV-679, 2016 WL 4194136, at *2 (N.D. Ohio Aug. 9, 2016) (internal citations omitted). Plaintiff fails to allege any conduct that could be plausibly characterized as outrageous or extreme. She also fails to plausibly

19

allege any actionable emotional injury she faced as a result of the Defendants' actions. She states only that her "already tenuous mental state" was "exacerbated." [23] ¶ 51. This does not meet the standard of "serious mental anguish." Additionally, Plaintiff has pleaded no facts to suggest Defendants intended to cause her emotional injury.

This Court dismisses Count XI.

### IV. Conclusion

For the foregoing reasons, the Court grants Defendants' motion to dismiss, [27], and dismisses the Second Amended Complaint. Plaintiff has amended her complaint twice and failed to cure the deficiencies in her two prior complaints. The Second Amended Complaint contains no allegations that suggest Defendants' conduct gives rise to any cause of action or that such conduct caused Plaintiff any harm. Thus, the Court finds that any amendment would be futile and dismisses the Second Amended Complaint with prejudice. Civil case terminated.

Dated: April 2, 2025                    Entered:

                                        _____
                                        John Robert Blakey
                                        United States District Judge